# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:10-cr-10074-JPM |
| ) | |
| LORNE ALLEN SEMRAU, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## BENCH OPINION ON SENTENCING ISSUES

This case comes on for sentencing of Defendant Lorne Allen Semrau ("Defendant" or "Semrau") following the jury's guilty verdict returned June 17, 2010. Defendant was charged with sixty counts of health care fraud and eleven counts of money laundering related to the misrepresentation of services billed to Medicare. (See Second Superseding Indictment ("Indictment") (D.E. 80).) On June 17, 2010, after a thirteen (13) day trial, the jury returned a verdict of "Guilty" on three counts of health care fraud in violation of 18 U.S.C. § 1347. (Verdict (D.E. 249).) The jury returned a verdict of "Not Guilty" on the money laundering counts and the fifty-seven remaining health care fraud counts. (Id.)

The three counts of conviction involved the upcoding of services provided by Dr. Roy Barnes on April 11, 2004 to three

patients. On the log sheet provided to Superior/Foundation, Dr. Barnes circled "62" indicating that the services rendered by him to these patients were properly described by CPT code 90862. Defendant instructed that the services rendered by Dr. Barnes be billed by corporate personnel under CPT code 99312 instead.[1]

The Court held a sentencing hearing on December 22, 2010. Based upon the parties' respective position papers to the Presentence Report ("PSR")[2] and the testimony presented at the hearing, the Court now issues the following as its decision on the issues of (i) relevant conduct and (ii) loss calculation.

# I. ANALYSIS

## A. Relevant Conduct

Under the United States Sentencing Guidelines ("U.S.S.G." or the "Sentencing Guidelines"), relevant conduct includes "all acts and omissions [committed by the defendant] that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). Defendant's

---

[1] The background facts of this case are discussed in detail in the Court's November 23, 2010 Order. (See D.E. 308.)

[2] The U.S. Probation Office sent the initial Presentence Report to the Court on October 25, 2010. On November 3, 2010, the U.S. Probation Office prepared a Revised Presentence Report, which recalculated the intended loss for guideline computational purposes. On October 20, 2010, the Government filed its position with respect to sentencing. (Position of the United States with Respect to the Sentencing (D.E. 292) ("Govt.'s Position").) On November 15, 2010, Defendant filed his position with respect to sentencing. (Def.'s Position with Respect to Sentencing (D.E. 299) ("Def.'s Position").) The U.S. Probation Office filed an Addendum to the Revised Presentence Report on November 22, 2010. On December 17, 2010, Defendant filed a Supplemental Memorandum in Support of his Position with Respect to Sentencing. ("Def.'s Supp. Mem.") (D.E. 316.)

2

relevant conduct for sentencing purposes defines the loss amount
which, in turn, determines the offense level for a crime of
fraud. Id. § 2B1.1(b).

Section 1B1.3(a)(2) directs the sentencing court to base
the loss amount, with respect to offenses grouped together under
§ 3D1.2(d),[3] on acts "that were part of the same course of
conduct or common scheme or plan as the offense of conviction."
"Thus, claims not included in the representative sample
contained in the indictment can still form the basis of the loss
amount for sentencing purposes because they were part of the
same course of conduct as the claims constituting formal charges
that [Semrau] was convicted of." United States v. Silber, No.
09-20223, 2010 WL 5174588, *6 (E.D. Mich. Dec. 15, 2010); see
also United States v. Culberson, Nos. 07-2390, 07-2425, 2009 WL
776106, at *3-4 (6th Cir. Mar. 24, 2009) (considering claims in
a loss calculation because they were submitted pursuant to the
"same particular and regular billing pattern" as other
fraudulent health insurance claims). Likewise, the sentencing
court, in determining a defendant's relevant conduct for
sentencing purposes, may consider both acquitted and uncharged
conduct provided that conduct is similar to the conduct
underlying the offense(s) of conviction and is established by a

---

[3]     Counts 16, 17, and 18 are grouped pursuant to the provisions of
U.S.S.G. § 3D1.2(d).

preponderance of the evidence. See United States v. Watts, 519 U.S. 148, 157 (1997) (concluding "that a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence"); see also e.g., United States v. White, 551 F.3d 380, 385 (6th Cir. 2007) ("So long as the defendant receives a sentence at or below the statutory ceiling set by the jury's verdict, the district court does not abridge the defendant's right to a jury trial by looking to other facts, including acquitted conduct, when selecting a sentence within that statutory range."); United States v. Maken, 510 F.3d 654, 658 (6th Cir. 2007) ("Relevant conduct is not limited to conduct for which the defendant has been convicted."). Conduct may only be included in the sentencing calculation pursuant to § 1B1.2(a)(2), however, if it "amounts to an offense for which a criminal defendant could potentially be incarcerated." United States v. Shafer, 199 F.3d 826, 831 (6th Cir. 1999).

For sentencing purposes, the Government analyzed the fraudulent claims by separating them into five tiers of possible relevant conduct.[4] (Govt.'s Position 5-9.) Tier 5, the smallest

---

[4] Tier 1 and Tier 2 consist of all the claims involved in Counts 1 through 60, including all the upcoding claims and all the AIMS claims. Tier 1 calculates the loss amount based on the total paid out by Medicare and Medicaid, for a total loss of $2,120,898.21. Tier 2 calculates the loss amount for the upcoding claims by subtracting the difference between what was

in scope, consists of all of Dr. Barnes's upcoding claims similar to the counts of conviction. The Government presented additional evidence at the sentencing hearing regarding this tier of potential relevant conduct. Counts 16, 17, and 18, the counts of conviction, involved Dr. Barnes's progress notes from April 11, 2004, on which the "status" section was blank with no boxes checked for the patient's current status, the "behavioral" section notes either "stable" or "no change", the "summary of session" section noted "no change," and the "recommendation per Dr." section noted "none." Based on a review of these progress notes, Dr. Baer testified at trial that the services performed by Dr. Barnes were not billable.

After the jury verdict, the Government located 7,352 of the

---

billed/allowed/paid by Medicare for CPT Code 99312 and what would have been billed/allowed/paid by Medicare if Semrau had billed the claims under CPT Code 90862. Tier 3 consists of all the upcoding claims involved in Counts 1 through 30 and calculates the loss amount similar to that in Tier 2 by taking the difference between 99312 and 90862. Tier 4 consists of all of Dr. Barnes upcoding claims and calculates the loss by taking the difference between 99312 and 90862.

Similarly, Defendant analyzed the fraudulent claims by separating them into four tiers of possible relevant conduct for sentencing purposes. (Def.'s Supp. Position 16-18.) Tier 1 consists of the three counts of conviction, calculated without any offset for the value of the services provided. Tier 1 proposes that the total loss is $175.00. It is unclear the specific conduct that Defendant contends is relevant in Tier 2, but he suggests that any loss calculation should be reduced using a downward departure to less than $10,000 to avoid deportation issues. Tier 3 consists of all the progress notes of Dr. Barnes, calculating the loss amount by taking sixty percent of the total difference in Medicare billed amounts between 99312 and 90862. Defendant bases this percentage on the ratio of guilty counts to total counts involving a progress note by Dr. Barnes–3 out of 5. In the alternative, Defendant suggests that Tier 3 should consist of the 5,213 "similar to conviction" claims, with the loss amount calculated as the difference in Medicare billed amounts between 99312 and 90862. Finally, Defendant's proposed Tier 4 consists of the same relevant conduct in Tier 3, but calculated based on the difference between the 99312 billed amount and the 90862 paid amount.

5

7,657 progress notes prepared by Dr. Barnes that were upcoded by Semrau to a 99312. The Government conducted a preliminary review of these progress notes and submitted 5,251 to Dr. Baer for review. At the sentencing hearing, Dr. Baer testified that 5,213[5] of these progress notes are clinically identical to those of the counts of conviction. That is, on each of these progress notes, the "status" section is blank with no checked boxes, the "behavioral" section notes either "stable" or "no change", the "summary of session" section notes either "stable" or "no change" and the "recommendation per Dr." section notes "none." The Court reviewed the 5,213 progress notes and excluded 14 of them, finding that they were dissimilar to the progress notes related to the counts of conviction.[6] Though Defendant disputes Dr. Baer's assessment of the import of the documentation on these progress notes, he does not appear to dispute that the documentation itself is substantially similar to the counts of conviction.

---

[5] Of the 5,251 progress notes Dr. Baer reviewed, he excluded 13 notes because they were illegible due to the poor copy quality. He excluded 25 notes because they were different than those of the counts of conviction. On these notes, Dr. Barnes made some change in the medication. Dr. Baer stated that this provided some evidence of medical decision sufficient to support a billable service, though he explained that they would still not support CPT 99312. The remaining 5,213 progress notes were clinically identical to the counts of conviction and, in Dr. Baer's opinion, do not represent a billable service.

[6] The 5,213 progress notes the Government averred were similar to the counts of conviction were saved to a compact disc and submitted to the Court as Exhibit 13. The Court reviewed all of the progress notes saved to the disc and found that 14 were dissimilar to the counts of conviction. The Government conceded that it made some errors saving the records to the disc and likely included some progress notes in error.

6

The Court, in its discretion and giving deference to the jury's verdict, finds that the "relevant conduct" for purposes of sentencing is the 5,199 "similar to conviction" upcoding claims. The jury acquitted Semrau on 27 of the 30 upcoding counts and acquitted him on all of the AIMS counts. The jury heard evidence from Dr. Baer at trial that the services described in the progress notes for the counts of conviction supported no code. Of all the counts, Counts 16, 17 and 18 were the only ones that Dr. Baer asserted were not even billable services based on his review of the progress notes. The jury determined that these three representative claims to Medicare were fraudulent under 18 U.S.C. § 1347. Likewise, the Court finds that the 5,199 claims shown by a preponderance of the evidence to be substantially similar to the progress notes related to the counts of conviction constitute conduct relevant to the sentencing analysis.

The Court declines to consider the acquitted conduct involved in counts 31 through 60, because the AIMS testing conduct dealt with different services, facts, and circumstances than the upcoding counts of conviction. Likewise, the Court declines to consider the upcoding claims of the other Superior/Foundation psychiatrists because the counts of conviction involved progress notes of Dr. Barnes and no other treating physician. Additionally, the Court declines to consider

all 7,657 of the upcoding claims involving Dr. Barnes because the evidence adduced at the sentencing hearing demonstrated that only 5,199 of these upcoding claims were clinically identical to the counts of conviction.

Out of an abundance of caution, and in deference to the jury's verdict, the Court declines to expand the relevant conduct for purposes of sentencing beyond the 5,199 claims demonstrated by a preponderance of the evidence to be substantially identical to the counts of conviction and therefore, fraudulent.

### B. Loss Calculation

Under the Sentencing Guidelines, the offense level for a crime of fraud is driven by the dollar value of the loss caused by the criminal conduct. The commentary to § 2B1.1 indicates that "loss" for purposes of the enhancement is "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, cmt. n. 3(A). "Actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense," id. § 2B1.1, cmt. n. 3(A)(i), while "intended loss" is "the pecuniary harm that was intended to result from the offense," id. § 2B1.1, cmt. n. 3(A)(ii). It is irrelevant to the intended loss calculation whether or not the intended harm "would have been impossible or unlikely to occur." Id. § 2B1.1, cmt. n. 3(A)(ii) (citing "an insurance fraud in which the claim exceeded the insured value"

as an example). In situations where the total loss is not easy to quantify, sentencing courts "need only make a reasonable estimation of loss." Id. § 2B1.1, n. 3(C).

To determine the intended loss, the Court must first address whether the loss calculation should be based on the amount billed to Medicare or the amount paid out by Medicare.[7] The Government argues that the amount billed should be used for determining the loss amount for guideline calculations. (See Govt.'s Position 2.) In support, the Government cites several cases where courts have upheld the use of the billed amount to Medicare for calculating the intended loss.[8]

In his position paper regarding sentencing, Defendant correctly notes that in all of the cases cited by the Government, there is no evidence that the defendant knew about

---

[7] The Court's reference to the total amount paid out by Medicare includes those amounts paid out by Medicaid as well.

[8] The Government cites the following cases in support: United States v. Mikos, 539 F.3d 706, 714 (7th Cir. 2008)(holding that the total amount billed to Medicare was the "intended loss whether Medicare paid or not—unless some of the claims were legitimate"); United States v. Serrano, 234 Fed. App'x 685, 687 (9th Cir. 2007)(holding that the sentencing court "properly interpreted § 2B1.1 and . . . did not clearly err when it approximated the intended loss as the amounts appellant submitted to Medicare and Medi-Cal for reimbursement"); United States v. McLemore, 200 Fed. App'x 342, 344 (5th Cir. 2006)(allowing no set off for the value of any Medicare or Medicaid services actually rendered or products provided in holding that the determination of the amount of loss for calculations under § 2B1.1(b)(1) requires the use of the greater or actual loss or intended loss); United States v. Cruz-Natal, 150 Fed. App'x 961, 964 (11th Cir. 2005)(approving use of the billed amount to calculate intended loss in Medicare fraud case because the intended loss was easily calculated and greater than the actual loss); United States v. Miller, 316 F.3d 495, 504-05 (4th Cir 2003)(affirming the district court's calculation of intended loss as the difference between what the defendant billed to Medicare and the amount to which he was legitimately entitled based upon the rendered service).

9

the Medicare fee schedule or was well-versed in Medicare billing reimbursements.[9] Defendant contends that, because the evidence adduced at trial showed that Semrau knew what amounts were being reimbursed and knew that the bills submitted were not fully reimbursable, the intended loss here should be based on the amount paid out by Medicare, not the amount billed.

In United States v. Miller, a mail-fraud case involving overbilling of Medicare and Medicaid, the Fourth Circuit noted that the defendant had introduced no evidence that he actually intended to bill only as much as provided on the government-established fee schedule, or that he was aware of the fee schedules and knew the amount that Medicare or Medicaid would actually pay out. 316 F.3d at 504. The court stated that if he had, "he might well have overcome the usual presumption that a 'bill is a bill.'" Id. Absent such evidence, the Fourth Circuit held that the district court did not "clearly err in relying on the amount [the defendant] billed Medicare and Medicaid as prima facie evidence of the amount of loss he intended to cause." Id.

Similarly, in United States v. Culberson, the Sixth Circuit affirmed the district court's determination that the best evidence of what the defendant "attempted to obtain" was the

---

[9] In United States v. McClemore, the Defendant argued at sentencing that he never actually expected to receive the amounts for which he billed Medicare because "everybody knows when the claim [is] submitted, there's no intention or expectation that they're going to pay anything but the allowable." 200 Fed. App'x at 344 n.1. The district court dismissed this contention and the defendant did not argue the point on appeal. Id.

10

fraudulent bills that he submitted to the provider. 2009 WL 776106, at *3. Though the defendant argued at sentencing that he did not expect to receive the entire amount billed, he "never testified about his own intent or offered evidence showing that he knew what amounts [Medicare] was likely to pay out." Id. (citing Miller, 316 F.3d at 504-05.)

Conversely, in United States v. Singh, the Second Circuit reversed the district court's use of the amount billed to Medicare to calculate the intended loss where the defendant was a physician who testified at length about his familiarity with the Medicare billings and receipts of his medical practice. 390 F.3d 168, 193-94 (2d Cir. 2004). Distinguishing Miller, the Second Circuit held that the defendant should "have a further opportunity on remand to show, if he can, that the total amount he expected to receive from the insurers was indeed less than the amounts he actually billed." Id. at 194.

Taken together, these cases instruct that a defendant's testimony regarding his intent and his knowledge of Medicare and Medicaid reimbursement practices is relevant to the loss calculation. Where a defendant has offered no evidence to suggest that the amount billed "either exaggerates or understates the billing party's intent," the amount billed is prima facie evidence of the amount of loss the defendant intended to cause. Miller, 316 F.3d at 504. Where, however, a

11

defendant testifies about his own intent and offers evidence that he is knowledgeable regarding the government's fee schedules and the differences between what is billed to Medicare and what is reimbursed, the loss calculation should be determined based on the paid amount. This loss amount more accurately reflects the loss a defendant intended to cause through is fraudulent scheme. Id.; Singh, 390 F.3d at 193-94; Miller, 316 F.3d at 504-05.

    Accordingly, the intended loss for sentencing purposes should be determined by reference to Semrau's testimony regarding his intent and knowledge of Medicare billing schedules and reimbursement amounts. Semrau testified that his intent in upcoding all 90862s to 99312s was to increase the reimbursement being paid out because the amount reimbursed by Medicare for 99312s was more than that paid for 90862s. (Semrau Test. 74, 282-86.) Semrau further testified that he was solely responsible for the billing and coding decisions made by Superior/Foundation. (Id. at 62-63.) The evidence adduced at trial showed that Semrau knew the amount he billed to Medicare would not be the amount he would be reimbursed for the claims. Therefore, the Court finds that the amount Semrau was reimbursed for the 5,199 fraudulent claims is the proper measure of the loss Semrau intended to cause through his fraudulent upcoding scheme. That amount is $249,196.48. (See Sentencing Hr'g Ex.

23.)

The second question the Court must address is whether the total paid amount should be offset by the amount that Semrau could have received had he submitted the claims under CPT code 90862. The question rests on whether the preponderance of the evidence supports a finding that, for the 5,199 "similar to conviction" claims, a billable service was provided. Defendant argues that Dr. Barnes provided legitimate services to his patients and, accordingly, that the Medicare program has suffered no loss. The Government counters that the progress notes similar to the counts of conviction represent a service not billable to Medicare; thus, the total paid amount is the appropriate loss amount without any offset.

The general rules for computing loss provide for crediting the fair market value of any services actually rendered before the offense was detected against the amount of loss. See U.S.S.G. § 2B1.1, cmt. n. 3(E)(i). Thus, if some of the fraudulent claims represented a billable service, the loss calculation should be reduced by that amount. See Mikos, 539 F.3d at 714 (stating that the amount the defendant billed to Medicare was the "intended loss whether Medicare paid or not-unless some of the claims were legitimate"). On the other hand, if the evidence establishes that the services provided were not billable to Medicare, the intended loss is the total reimbursed

13

to Semrau for the 5,199 fraudulent claims. Id. (finding that all of the claims submitted to Medicare were illegitimate where the services provided by defendant to his patients were not covered by Medicare and "not one penny was payable").

The Government presented evidence at trial and at sentencing that 5,199 progress notes indicated a service not billable to Medicare. Accordingly, the Government argued that there should be no credit to the loss calculation for the illegitimate claims. Dr. Baer testified at trial that the progress notes associated with Counts 16, 17, and 18 were not billable to Medicare. At the sentencing hearing, Dr. Baer testified that 5,213 progress notes of Dr. Barnes were essentially identical to those of the counts of conviction and, like the counts of conviction, represented no billable service to Medicare. Dr. Baer explained that there was no evidence of a mental status examination documented on these progress notes. The notation of "stable" in the behavior and summary of session sections was ambiguous without any documentation of the patient's current or previous state. The notation of "no change" was meaningless for a third-party reviewing the progress note because it indicated only that at some point in the past, someone diagnosed the patient with a psychiatric disorder. Dr. Baer asserted that, based on what was documented, there was no evidence that Dr. Barnes had any face-to-face interaction with

14

the patient. He concluded that these 5,213 progress notes—each indicating stable/no change, stable/no change, none—did not represent billable services.

Moreover, the Government presented circumstantial evidence at trial that impeached Defendant's allegations that the services actually performed by Dr. Barnes amounted to a service billable as a CPT code 99312. As discussed in the Court's November 23, 2010 Order, the Government adduced evidence at trial that tended to establish Semrau's knowledge that the codes selected were improper, including the CIGNA audit, the CPT code descriptors, Dr. Barnes's documentation on the progress notes, the timeline of coding decisions, and the number of medication management reviews allegedly being performed by Dr. Barnes on a given day. (See D.E. 308 at 40-45.) Likewise, at the sentencing hearing, Dr. Baer stated that it was impossible for Dr. Barnes to have performed the services described on over seventy patients per day. Further, he testified that it would have been virtually impossible to perform those services and then remember from month-to-month the signs and symptoms that would lend meaning to Dr. Barnes's documentation of stable/no change, stable/no change, none.

In rebuttal, the defense called Dr. Chester Schmidt. Dr. Schmidt disagreed with Dr. Baer's opinion that 5,213 progress notes were clinically meaningless. He testified that the

progress notes had to be placed in the context of the complete patient record. He explained that "stable" would indicate to the medical staff that the patient was doing well and that his or her condition had not changed. This, he asserted, coupled with the pre-printed diagnosis code, represented a billable service. Furthermore, Dr. Schmidt stated that the services were necessary and reasonable and that they would support a CPT 99312 code if Dr. Barnes did all that he testified to. When questioned on cross-examination, however, Dr. Schmidt conceded that it would be difficult, if not impossible to see over seventy patients in one day and do everything that Dr. Barnes testified that he did for medication review visits.

The Court finds credible Dr. Baer's assessment of Dr. Barnes's progress notes and the services Dr. Barnes was providing. Dr. Baer's testimony was consistent with the circumstantial evidence presented at trial, which tended to establish Semrau's intent to defraud on Counts 16, 17, and 18. Furthermore, the Court rejects the testimony of Dr. Schmidt, finding that his analysis of the progress notes similar to the counts of conviction lacks credibility.

## II. CONCLUSION

Accordingly, the Court finds by a preponderance of the evidence that the loss Semrau intended to cause is the total paid out by Medicare/Medicaid for the 5,199 claims: $249,196.48.

The preponderance of the evidence demonstrates that these 5,199 claims were fraudulent and supported no billable service to Medicare.

**IT IS SO ORDERED,** this 3rd day of January, 2011.

                                          /s/ JON PHIPPS McCALLA
                                          CHIEF UNITED STATES DISTRICT JUDGE